IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )    No. 13-20240-SHM-dkv |
| | ) |
| TOMMY HOLMES, | ) |
| | ) |
|     Defendant. | ) |

_____

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

_____

On July 25, 2013, the defendant, Tommy Holmes ("Holmes"), was indicted on one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g). The charge arises out of an investigation by the Memphis Police Department's Organized Crime Unit into an anonymous cyber-tip, which led to the arrest of Holmes on an arrest warrant and the search of his apartment on the consent of Holmes's wife, Sheila Holmes. During the search, a firearm allegedly belonging to Holmes was found.

Now before the court is Holmes's October 4, 2013 motion to suppress any and all evidence derived from his arrest on the grounds that the arrest warrant was invalid and the consent search of the apartment was illegal in violation of the Fourth Amendment. (D.E. 24.) On November 6, 2013, the government filed a motion for leave to file a late response to Holmes's

motion to suppress, (D.E. 29), which the court granted, (D.E. 31), and the government filed a response the same day, (D.E. 27). The motion was referred to the United States Magistrate Judge for a report and recommendation.

Pursuant to the reference, a hearing was held on November 15, 2013. On the request of Holmes, the court held a *Franks* hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), in which Holmes challenged the veracity of factual statements made in the affidavit supporting his arrest warrant.[1]

At the hearing, the government called two witnesses, Detective Brandon Evans and Sheila Holmes. The government also introduced into evidence, a consent to search form signed by Mrs. Holmes that granted Detective Evans and another officer permission to search her apartment at 1773 Gowan Street, Apartment 1, Memphis, Tennessee, (Ex. 1). Holmes called three witnesses: Investigator Eileen Knoblock, Special Agent Roderick McDavis, and Maryetta Rudd. He also introduced into evidence five exhibits: the Memphis Police CyberWatch Tip that led to

---

[1] To be granted a *Franks* hearing, Holmes was required to make a substantial preliminary showing that a false statement was made knowingly, intentionally, or with reckless disregard for the truth, that the allegedly false statement was included by the affiant in the arrest warrant affidavit, and that the statement was necessary to the finding of probable cause. *See Franks*, 438 U.S. at 155-56. The court found that Holmes made a sufficient preliminary showing that the affidavit upon which the warrant was based contained a falsity in its statement of the offense committed, but noted that whether the falsity was made with reckless disregard for the truth remained to be seen.

Holmes's investigation, (Ex. 2); Holmes's arrest warrant, (Ex. 3); two reports generated by the Tennessee Offender Management Information System, (Exs. 4 & 5); and a judgment order for Holmes's release dated November 14, 2011, (Ex. 6).

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied in full.

## I.   PROPOSED FINDINGS OF FACT

On February 24, 2013, an anonymous informant submitted a tip to the Memphis Police Department through its CyberWatch website ("the CyberWatch Tip"), which stated the following:

COMPLAINT[:] His name is Tony Holmes aka Tommy Holmes, he has been brandeshing [sic] a pistol and trying to intimidate residents at the Timber Pines Apts you will need to see office for apt but it is probably under his wife Sheila Holmes name.  He is also a convicted felon and registered sex offender so he says.  He just pulled up talking crazy to people and pulled out his pistol saying he would kill everyone.

. . . .

DESCRIBE [ACTIONS:] Acts like he is high on powder cocaine threatening people with a pistol

OTHERINFO[:] This person seems to be crazy or something his wife looks like he beats her and he has robbed a few people in this area recently since tax checks started coming out

(D.E. 27-1 at 2.)    The complaint was time stamped 5:06AM and stated that the incident occurred between midnight and 5:00AM at 1749 Gowan Street, Memphis, Tennessee. (*Id.*)

On February 28, 2013, Memphis Police's investigation into the CyberWatch Tip began when, as Detective Brandon Evans ("Detective Evans") testified, he received the tip from his lieutenant during morning roll call.  Detective Evans has been a detective in the Memphis Police Department's Organized Crime Unit for the past six months and an officer with the Memphis Police for the past four-and-a-half years.  Since February of 2011, he has been stationed at the Old Allen precinct, which includes the Timber Pines Apartments located at 1749 Gowan Street.   Detective Evans testified that on the morning of February 28, 2013, the lieutenant handed him and other members of his task force printed copies of the CyberWatch Tip, which had been forwarded via e-mail to the lieutenant.   On cross-examination, Detective Evans agreed that the information provided in the CyberWatch Tip alone did not give rise to probable cause to arrest Holmes.   When questioned why the Memphis Police only began to investigate the tip four days after it was submitted to the CyberWatch website, Detective Evans answered that he did not notice the time stamp on the CyberWatch tip, he was unaware of the way that the CyberWatch website functioned and whether the time stamp in fact denoted the time a

tip is submitted, and he merely follows orders from his lieutenant.

As described by Detective Evans, he and the task force began their investigation by researching the complaint, the person named in the complaint, and the Timber Pines Apartments. His research of Tommy Holmes included the use of the Shelby County warrant database, which provides a person's criminal history, reports, and driver's license information. When Detective Evans researched Tommy Holmes by typing his name into the database, he found no active warrant or violation. He also called the leasing office at the Timber Pines Apartments and learned that Sheila Holmes was listed as the lease holder of an apartment in the complex located at 1773 Gowan Street, Apartment 1. Detective Evans again admitted on cross-examination that at this time, neither he nor anyone in his task force had probable cause to arrest Holmes.

Detective Evans then called Agent Roderick McDavis ("Agent McDavis"), a special agent with the Tennessee Department of Corrections, Office of Compliance, whom Detective Evans had worked with over the past year and a half to research whether suspects under investigation are on probation or parole. Detective Evans stated that Agent McDavis is a reliable source in his experience. When asked whether his overall goal in calling Agent McDavis was to search Holmes's apartment,

Detective Evans said that his overall goal was to investigate the complaint, the person named in the complaint, and any rules of probation that person had.

Though there were some minor discrepancies in the testimony of Detective Evans and Agent McDavis regarding their telephone conversation, the court finds that their testimony was largely consistent with one another and that both witnesses were credible. While on the phone with Detective Evans, Agent McDavis searched Holmes's name in the Tennessee Offender Management Information System ("TOMIS") — the database that provides parole information — and in the sex offender registry. Agent McDavis discovered that though Holmes was not on parole, Holmes was a registered sex offender.[2] As Agent McDavis explained, sex offenders receive a different type of supervision than other parolees called community supervision for life. Community supervision for life requires the sex offender to report regularly to a state agency. Agent McDavis then advised Detective Evans that he would call the unit responsible for sex

---

[2] Detective Evans testified that Agent McDavis's research showed that Holmes was a sex offender who had failed to register, while Agent McDavis testified that Holmes was a registered sex offender who had a reporting requirement, as all sex offenders do. The court finds this inconsistency in testimony insignificant. Because Agent McDavis was more familiar with the databases used to discover the status of parolees or sex offenders and because his testimony concerning his research of Holmes on February 28, 2013 was more specific, the court finds Agent McDavis's testimony controlling in this matter.

offenders, the Program Supervision Unit ("PSU"), to find out more information about Holmes.

Agent McDavis testified that he has been with the Tennessee Department of Corrections, Office of Compliance, since July 2012 and has been with the Probation and Parole department since 2006. He stated that his responsibilities include working closely with police officers and state, local, and federal agencies to locate and apprehend fugitives. He is also given access to the TOMIS database in his position. Though he has full statutory authority to generate a warrant, his job does not include acting as a supervising officer to parolees or sex offenders. Typically, Agent McDavis explained, the probation or parole officer assigned to a particular individual is responsible for obtaining a warrant. Because Agent McDavis does not supervise sex offenders, he stated that he needed to call PSU to find out more information about Holmes after his own research. Following his phone conversation with Detective Evans, Agent McDavis called PSU.

When Agent McDavis contacted PSU, he spoke with Manager Joe Williams ("Manager Williams"). Manager Williams researched Holmes in the PSU system to discover that Holmes should have been reporting to the Tennessee Department of Corrections, Office of Parole and Probation, as a sex offender under community supervision for life, but had never reported. Manager

Williams informed Agent McDavis that he would request a warrant. Though Manager Williams did not testify at the hearing, Maryetta Rudd ("Rudd"), a probation officer at the Tennessee Department of Corrections, Office of Parole and Probation, testified that Manager Williams thereafter directed her to prepare an affidavit of complaint for Holmes based on his failure to report to the Department of Corrections.

In her position as a probation officer, Rudd's responsibilities include monitoring offenders in custody or in violation of the terms of their parole. She looks up information about offenders at the direction of Manager Williams and occasionally prepares an affidavit of complaint for a judicial officer to sign. Rudd drafted Holmes's affidavit of complaint on February 28, 2013, which stated the following:

> Personally appeared before me **Maryetta Rudd** and made oath that on or about the **17st**day [sic] of **November, 2011,** in said county and within the jurisdiction of the Criminal Court of Shelby County, Tennessee, one, **Tony Holmes AKA Tommy Holmes** age **40**, sex **MALE**, whose last known address is **2571 Wellons Memphis, TN 38127**, did unlawfully commit the offense(s) of **VIOLATION OF COMMUNITY SUPERVION FOR LIFE—Misdemeanor (TCA: 39-13-526) 1 CT** and the essential facts constituting said offense(s) and the source of the affiant's information are as follows: [Tony Holmes AKA Tommy Holmes was convicted of Rape (DK#02-02082) on or about 11/14/2011. As a result of this conviction, Tony Holmes AKA Tommy Holmes was sentenced to Community Supervision for Life pursuant to Tennessee Code Annotated 39-13-524 and is required to adhere to supervision by the Tennessee Board of Probation and Parole. Mr. Holmes is classified as a violent Sex Offender and therefore is required by State Law to

report to Tennessee Department Of Correction Board Of Probation And Parole in person within 72 hours after his release from incarceration.

Tony Holmes AKA Tommy Holmes has violated Rule#1 to his Community Supervision for Life Certificate, which states, "I will proceed directly to my destination and upon arrival report immediately to my Probation/Parole Officer or in any event no later than 72 hours after release." Count #1(M): On or about November 17th, 2011 Mr. Holmes failed to report in person to Tennessee Department Of Correction Probation and Parole within the allotted 72-hour period. This offense occurred in Shelby County, TN.

(Ex. 3; D.E. 27-5 at 1.)[3]

To draft the affidavit of complaint, Rudd testified that she researched Holmes on several electronic databases, but she did not speak to anyone else about the complaint or make phone calls to the Memphis Police or any other agency to verify whether Holmes had been reporting to another agency.[4] The Tennessee Bureau of Investigations system revealed that Holmes was registered as a sex offender in the Tennessee Registry. Rudd also relied on documents generated in the TOMIS database, which Rudd brought to the hearing in response to a subpoena

---

[3]    Exhibit 3 is an unsigned copy of the affidavit of complaint. Rudd testified that she typically does not keep a signed copy in her own records, but she is usually able to locate a signed copy in her office's database. She stated that the database only pulled up the unsigned copy, and the government could not locate the signed version.

[4]    Defense counsel made much of the fact that Rudd did not make any phone calls to the Memphis Police to find out if Holmes had been reporting elsewhere, and Rudd appeared confused by defense counsel's line of questioning.

issued by Holmes and were entered into evidence as Exhibit 5.[5] Finally, Rudd testified that she relied on a judgment order dated November 14, 2011 ("the judgment order"), entered into evidence as Exhibit 6. The judgment order indicated that Holmes pleaded guilty to rape on November 14, 2011 and received a time-served sentence on that date.[6]

During Rudd's direct examination, defense counsel specifically questioned Rudd about the source of her statement in the affidavit of complaint "[o]n or about November 17th, 2011 Mr. Holmes failed to report . . . within the allotted 72-hour period." Defense counsel and Rudd proceeded through the TOMIS documents contained in Exhibit 5. Page 1 of Exhibit 5 is entitled "ARRIVAL/DEPARTURE DETAIL" and lists Holmes's departure date as November 23, 2011 from the Shelby County Criminal Justice Center and arrival date as November 29, 2011 to East Memphis Probation and Parole Office. Page 2 lists November 23, 2011 as the date that Holmes was "moved" to lifetime

---

[5] Rudd also brought a number of documents that she did not have access to at the time she drafted Holmes's affidavit of complaint, entered into evidence as Exhibit 4. These documents include TOMIS records obtained from the Tennessee Department of Corrections office in Nashville, Tennessee. After it was discovered on direct examination that Rudd did not rely on these TOMIS records in drafting her affidavit of complaint, nor did Rudd have access to them at that time, Exhibit 5 became the focus of counsel's questioning and Rudd's testimony.

[6] The judgment order states that Holmes served jail time from June 24, 2001 to November 14, 2011. Holmes's ten year sentence was reduced to eight years and six months.

supervision.  The final page, entitled "CONTACT NOTES" and dated

November 14, 2013, states a "Contact Date" of November 28, 2013

and comments that the "DEF WILL BE SENT HOME TODAY."  When

questioned as to why she wrote November 17, 2011 as the offense

date when the documents in Exhibit 5 give later dates, Rudd

answered that she relied on Exhibit 6, the judgment order dated

November 14, 2011.  Seventy-two hours from that date gave her

the estimate that Holmes should have reported "[o]n or about

November 17, 2011."  Rudd testified that although she looked at

the TOMIS records with the November 23 and 29 dates, the

judgment order is a court document, which takes precedence over

any other record.

On cross-examination by the government, Rudd verified that

she found no supervision records in Holmes's file, not only

because he failed to report within seventy-two hours of his

release, but also because he had *never* reported to her

department, as required by law.  Because Holmes never reported,

he had not been assigned a supervising officer, and the

requirements for his regular reporting to the agency were never

set.  Rudd reiterated that TOMIS often contains inconsistencies

in dates, and she relied on the judgment from the court.  The

undersigned also questioned Rudd about the 2751 Wellons address

she used for Holmes's affidavit of complaint.[7] Rudd responded that the address came from the sex offender registry.

After preparing the affidavit of complaint, Rudd submitted it to a judicial officer to be signed. Manager Williams called Agent McDavis to inform him that the arrest warrant had been issued, and Agent McDavis in turn informed Detective Evans of the warrant number and that it was available to view on the state's database. Agent McDavis testified that he did not review the warrant himself, but advised Detective Evans that Holmes had violated the terms of his community supervision for life. Detective Evans testified that he verified Holmes's arrest warrant number but he did not have a copy on hand when he executed the warrant on February 28, 2013. He stated that he had not seen the warrant until the present suppression hearing before the court, and he does not know Maryetta Rudd.

Detective Evans and another officer, Officer Hudson, then went to Mrs. Holmes's address at 1773 Gowan Street, Apartment 1. When the officers knocked on the door, Holmes answered. The officers informed Holmes they had a warrant for his arrest,

---

[7]    Notably, Holmes's registered sex offender address is different than the Timber Pines Apartments address. Though the parties did not discuss this at the hearing or in their briefs, Tenn. Code Ann. § 40-39-203(a)(4) requires that a sex offender report any change of information contained in his or her registration form to the registering agency within forty-eight hours. Registration forms require that the offender give a current physical address. Tenn. Code Ann. § 40-39-203(i)(8).

which Holmes stated he was not aware of, and Holmes was placed under arrest. Detective Evans testified that Holmes was very compliant and that Holmes stated that he did not live at the 1773 Gowan Street apartment. Detective Evans and Officer Hudson then placed Holmes in the police car parked outside the apartment.

The officers thereafter returned to the apartment to request Sheila Holmes's ("Mrs. Holmes") consent to search of the apartment.[8] Mrs. Holmes testified at the suppression hearing that she has been married to Holmes since 1996 and that she wants to divorce him. At the time of the incident on February 28, 2013, she did not want a divorce, but events that transpired after his arrest — including one incident where Holmes attempted to push Mrs. Holmes's daughter out of a car — led her to this decision. She also stated that she had problems with Holmes prior to February of 2013 but that she loved him so much and he promised he would change. She testified that Holmes lived with her in her 1773 Gowan Street apartment at the time of the incident and had lived there since June of 2012.[9] No one else lived in the apartment with Holmes and Mrs. Holmes, though Mrs.

---

[8] Detective Evans testified that he did not ask Holmes for his consent because Holmes contended he did not live at the apartment.

[9] After Holmes's release in November of 2011 until June of 2012, the couple lived in a hotel. They moved to 1773 Gowan at that time.

Holmes's son spent the night there from time to time. Mrs. Holmes testified that the last time her son stayed at the apartment was a couple weeks prior to February 28, 2013.

Mrs. Holmes's testimony regarding the police's arrest of Holmes and subsequent search of the apartment was consistent with Detective Evans's testimony, and the court finds Mrs. Holmes to be credible. Mrs. Holmes testified that she was shocked on February 28, 2013 when the police arrived just as Holmes was about to take Mrs. Holmes to work. She typically works a 1:00 P.M. to 1:00 A.M. shift. When the police informed Holmes that they had a warrant and that they received a complaint that Holmes had been robbing people, breaking into others' apartments, and selling and taking drugs, she stated that she was also shocked and that she had never seen Holmes doing any of these things.

After Holmes was arrested, Detective Evans and Officer Hudson approached Mrs. Holmes in the front room of her apartment, where she was seated on the couch.[10] She remained seated and the officers stood. Mrs. Holmes testified the

---

[10]     Detective Evans testified that he and Officer Hudson were the two officers that approached Mrs. Holmes to request a consent search. Detective Evans also stated that at least two other officers arrived to help at some point during the arrest and consent search, but could not recall at what point. Mrs. Holmes testified that three or four officers were present during the request for her consent to search the apartment. The court finds this discrepancy in testimony to be minor and likely the result of the passage of time.

officers told her they needed to search the apartment and wanted her consent to do so.  She also testified that she had the option to say yes or no and that she did not want to go to jail for something she did not do; however, she was not worried that the police believed she was involved in any crime.  She stated that she was not coerced to consent to a search of her apartment, but she was a little scared and shaken up because she had never had police officers in her home.  Detective Evans likewise testified that he and Officer Hudson never threatened to arrest Mrs. Holmes to obtain her consent.  He explained the complaint to her, asked her for her permission to search the apartment, believed she understood what he said, and handed her the consent form.  Mrs. Holmes signed the consent form, entered in evidence as Exhibit 1.

Mrs. Holmes's apartment at 1773 Gowan is a small two-bedroom apartment.  As the police searched the premises, Mrs. Holmes accompanied them and was not secured by handcuffs. Detective Evans testified that there was no need to restrain her, as the situation was under control and Mrs. Holmes acted nice and did not seem scared.  In the master bedroom, the officers discovered a 9mm Lorcin pistol in a suitcase in the closet.  Clear bags containing cocaine residue were also recovered in the bedroom.  Mrs. Holmes informed the officers that the suitcase belonged to Holmes, that the handgun was not

hers or her son's, and that she was not aware of any cocaine in the apartment. She explained that the men's clothing and shoes found throughout the bedroom and in the closet were Holmes's and that she and Holmes resided in the master bedroom together. Her son, who occasionally visited, stayed in a separate empty room. Police also noticed photos of Holmes in the bedroom. After Detective Evans found the handgun, he transferred the gun to another officer who had arrived on the scene to tag it; that officer delivered it to the evidence room.

In an effort to impeach Mrs. Holmes's testimony concerning the consent search, defense counsel called Investigator Eileen Knoblock ("Investigator Knoblock"). Investigator Knoblock is an investigator in the federal public defender's office who spoke to Mrs. Holmes on the phone on several occasions during the two months leading up to the suppression hearing on November 15, 2013. On or about September 19, 2013, Investigator Knoblock called Mrs. Holmes early in the morning. She had attempted to contact Mrs. Holmes unsuccessfully on two prior occasions by calling the residence of Mrs. Holmes's daughter. On that day, Investigator Knoblock reached Mrs. Holmes, and Mrs. Holmes answered questions about February 28, 2013. Investigator Knoblock testified that Mrs. Holmes stated on the phone that the police told her that she must allow them to search her home or go to jail. The police also told her they had a warrant but did

not specify what kind.  She indicated she was frightened by the officers.  The remaining conversation between Investigator Knoblock and Mrs. Holmes corroborated Mrs. Holmes's testimony regarding the nature of the complaint against Holmes and the contraband discovered.

Mrs. Holmes also testified about her conversation with Investigator Knoblock.  She stated that she did not recall saying that the police threatened her with prosecution to obtain her consent to search the apartment.  All that she spoke about with Investigator Knoblock was the subpoena that the investigator left at her daughter's house.  The two did not talk about February 28, 2013.

The court finds Mrs. Holmes to be a credible witness and that her testimony was consistent with that of Investigator Knoblock in large part.  Though Investigator Knoblock testified that Mrs. Holmes told her the police threatened her, any statements Mrs. Holmes made to Investigator Knoblock were not made under oath.  Mrs. Holmes was a credible witness, whose testimony regarding the search of her apartment on February 28, 2013 was given under oath.  The court therefore relies on Mrs. Holmes's testimony as representing the facts in this case.

II.  PROPOSED CONCLUSIONS OF LAW

Holmes moves to suppress any and all evidence derived from his arrest on February 28, 2013 and the subsequent consent

17

search of the apartment located at 1773 Gowan, Apartment 1, on the grounds that (1) the arrest warrant was invalid due to false statements in the affidavit of complaint; (2) the good faith exception does not apply; and (3) the search of the apartment violated the Fourth Amendment. In response, the government argues that (1) the arrest warrant was valid because there are no false statements in the warrant; (2) even if there were false statements, the Memphis Police relied in good faith on the warrant; (3) the search of the apartment was attenuated from the arrest such that they should be analyzed independently; and (4) Mrs. Holmes gave consent to search of the apartment voluntarily.

A.   Validity of the Arrest Warrant

During the suppression hearing on November 15, 2013, this court granted Holmes an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) after finding that Holmes made a substantial preliminary showing that a false statement was made in the warrant affidavit either intentionally or with reckless disregard for the truth and that the allegedly false statement was necessary to the finding of probable cause. According to *Franks*, the defendant must then satisfy a second evidentiary standard at the hearing:

> In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to

> establish probable cause, the search warrant must be
> voided and the fruits of the search excluded to the
> same extent as if probable cause was lacking on the
> face of the affidavit.

*Id.* Thus, a court considering whether to suppress evidence in a warrant affidavit containing false statement applies a two-part test: "(1) whether defendant has proven by a preponderance of the evidence that the affidavit contains deliberately or recklessly false statements and (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant." *United States v. Charles*, 138 F.3d 257, 263 (6th Cir. 1998).

Warrants carry a "presumption of validity," *Franks*, 438 U.S. at 171, and truthfulness in a warrant "does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily," *Id.* at 165. Rather, it means that the "information put forth is believed or appropriately accepted by the affiant as true." *Id.* The affiant should provide in the warrant affidavit the "particular facts and circumstances underlying the existence of probable cause" that would allow a judicial officer to independently evaluate the matter. *Id.* However, the Sixth Circuit has noted

that "[m]inor discrepancies in the affidavit may reflect mere inadvertence or negligence, rather than the reckless falsehood that is required for exclusion." *United States v. Elkins*, 300 F.3d 638, 649, 650 (6th Cir. 2002)("Warrant language may fall short of technical exactitude without necessarily violating the materiality and scienter requirements of *Franks*."); *see also United States v. Mick*, 263 F.3d 553, 562-64 (6th Cir. 2001)(concluding that five misstatements in the affidavit supporting the search warrant did not rise to the level of deliberate or reckless misstatements as required by *Franks* and, regardless, the affidavit otherwise supported the magistrate's finding of probable cause to search).

Holmes argues that the affidavit supporting Holmes's arrest warrant contains a falsity in the following statement: "[o]n or about November 17th, 2011 Mr. Holmes failed to report in person to Tennessee Department Of Correction Probation and Parole within the allotted 72-hour period." Holmes contends that the TOMIS records contained in Exhibit 5 and relied upon by Rudd to write the affidavit of complaint indicate that Holmes was not released from prison until November 28, 2011.[11] Accordingly, to

---

[11]    In his brief in support of his motion to suppress, Holmes stated his release date was November 23, 2011. (*See* Def.'s Mot. to Suppress, D.E. 24 at 3.)    During defense counsel's closing arguments at the suppression hearing, however, he argued that the release date was November 28, 2011 according to the documents contained in Exhibit 5.

comply with the seventy-two hour reporting requirement of his Community Supervision for Life Certificate, he would have needed to report on December 1, 2011. Holmes argues that Rudd recklessly disregarded these dates in the TOMIS records and wrote a false violation date of November 17, 2011. Additionally, Holmes contended at closing arguments that the testimony of Rudd and Agent McDavis shows that they were not actively supervising Holmes and did not speak with anyone who was. When Rudd saw discrepancies in the dates contained in the TOMIS documents and the judgment order, she should have investigated further to get the correct date; thus, the incorrect violation date and offense of violation of failure to report within seventy-two hours should be struck from the affidavit. Without this false information in the affidavit, Holmes argues the remaining information does not support probable cause.[12]

---

[12] Further, in Holmes's memorandum in support of his motion to suppress, Holmes asserts, "not only did Mr. Holmes properly register as a sex offender upon his release, but he was in full compliance of community supervision on or about February 28, 2013." (Def.'s Mot. to Suppress, D.E. 24 at 3.) However, Holmes did not argue this at the suppression hearing, and Rudd's testimony and the evidence contained in Holmes's TOMIS records indicate that Holmes in fact never reported to a state agency as required by Tenn. Code Ann. § 40-39-203(b)(2) (2010 & Supp. 2013). He was, however, registered in the state's sex offender registry, a requirement separate and apart from the terms of his community supervision for life. *See id.* § 40-39-203(b)(1).

The government responds that the warrant contains no false statements because "[o]n or about November 17th, 2011" is approximate and accounts for the small delay in the violation date. Even if the court determined this constitutes an inaccuracy, the government argues, it was not made knowingly or with reckless disregard for the truth; the information had to be garnered hastily, *see Franks*, 438 U.S. at 165, and Rudd relied on a reliable document, the judgment order. Additionally, the other information in the affidavit placed Holmes on notice of the violation with which he was charged. The government reiterated in closing arguments that Holmes had never reported to any state agency as required by the terms of his community supervision for life and Tennessee law. *See* Tenn. Code Ann. § 40-39-203(b)(2) (2010 & Supp. 2013) (requiring that an offender who is incarcerated and released report in person to the offender's registering agency within 48 hours of release).

The court finds that the statement, "[o]n or about November 17th, 2011," is not a false statement because it allows for some discrepancy in the date of violation. As recognized in *Franks*, truthfulness in a warrant does not mean that every fact submitted is correct, but that the affiant, based on the information available to them and on the particular facts and circumstances, sets forth information believed to be true. *Franks*, 438 U.S. at 165. Here, Rudd determined the violation

22

date to be November 17, 2011, based on a reliable document — a judgment order issued by a court. Further, there were discrepancies in the release dates provided in Exhibit 5. For instance, Page 1, entitled "ARRIVAL/DEPARTURE DETAIL," lists Holmes's departure date as November 23, 2011 from the Shelby County Criminal Justice Center and arrival date as November 29, 2011 to East Memphis Probation and Parole Office. The final document of Exhibit 5, entitled "CONTACT NOTES" and dated November 14, 2013, gives a "Contact Date" of November 28, 2013 and states that the "DEF WILL BE SENT HOME TODAY." Given these minor variations in dates, Rudd relied on a court-issued document to calculate that the violation occurred *on or about* November 17, 2011.

Even if this court were to find that the statement was false, Holmes failed to prove by a preponderance of the evidence that it was made intentionally or with reckless disregard for the truth. Rudd testified that she relied on the judgment order because in drafting a complaint, court documents take precedence over other documents. Reliance on this document does not rise to the level of deliberate or reckless misstatements as required by *Franks* and does not indicate any type of bad faith. The law recognizes that warrants are often based on information that is garnered hastily and that minor discrepancies in an affidavit do not reflect recklessness. *See Elkins*, 300 F.3d at 649. Any

discrepancy here, if it exists, is minor and would not require Rudd's further investigation to get every factual detail correct.

Finally, the affidavit without the allegedly false statement still provides the requisite probable cause to sustain the warrant. Striking the "[o]n or about November 17th, 2011" sentence from the affidavit, the affidavit still describes Holmes's status as a sex offender subject to community supervision for life. It further states that Holmes violated the terms of his Community Supervision for Life Certificate, which required him to "proceed directly to [his] destination and upon arrival report immediately to [his] Probation/Parole Officer or in any event no later than 72 hours after release." Whether the violation occurred on November 17, 2011 or on December 1, 2011, this description of the offense does not alter the underlying facts and circumstances that support probable cause. For the foregoing reasons, the court finds Holmes's arrest warrant to be valid.

B.   The Good Faith Exception

In any event, even if the arrest warrant here was invalid based on a misstatement in the affidavit, the government submits that this case falls under the "good—faith" exception of *United States v. Leon*, 468 U.S. 897, 926 (1984). However, the *Leon* Court held that the good faith exception to the exclusionary

rule does not apply where the warrant was obtained in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). *Leon*, 468 U.S. at 923 ("Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."). Were the court to find Holmes's arrest warrant invalid under *Franks*, the good faith exception would not apply to avoid suppression.

C.   Validity of the Consent Search

Holmes next objects to the consent search of the 1773 Gowan Street apartment. "It is without a doubt true that '[t]he Fourth Amendment test for a valid consent to search is that the consent be voluntary.'" *United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003)(quoting *Ohio v. Robinette*, 519 U.S. 33, 40 (1996)). However, the exclusionary rule may still operate to exclude evidence obtained by a consent search if the consent is not sufficiently attenuated from an illegal arrest. *See United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991). "In other words, not only must the consent be valid, *i.e.,* voluntary, as required by *Robinette,* but the causal chain between the illegal [arrest] and the consent must be broken to avoid the consequences of the exclusionary rule." *Lopez-Arias*, 344 F.3d at 629. The taint of an unlawful arrest can be purged by a subsequent consent to a search if the consent is the

product of "an intervening independent act of free will." *Wong Sun v. United States*, 371 U.S. 471, 486 (1963); *see United States v. Grant,* 920 F.2d 376, 388 (6th Cir. 1990). "Factors to consider in determining whether the consent is sufficiently removed from the taint of the illegal arrest include the length of time between the illegal seizure and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." *Richardson,* 949 F.2d at 858.

Thus, the court must consider whether Holmes's arrest warrant was sufficiently attenuated from the search of the 1773 Gowan Street apartment such that the warrant and the consent search should be considered independently. The government argues that Mrs. Holmes consented to the search of her apartment of her own free will and, if the court finds Holmes's arrest warrant invalid, Mrs. Holmes's valid consent purged the taint of the illegal arrest. Conversely, Holmes contends that Holmes's illegal arrest taints the subsequent consent search. Even if the arrest and the search were attenuated, however, he argues that Mrs. Holmes's consent was coerced.

Considering the factors listed in *Richardson*, the court finds that the search of the 1773 Gowan Street apartment by the consent of Mrs. Holmes was sufficiently attenuated from the arrest of Holmes. Though little time had passed between the arrest of Holmes and Mrs. Holmes's consent to search the apartment, the intervening voluntary consent of Mrs. Holmes and the lack of misconduct on the part of the Memphis Police indicate

the search should stand independently from the arrest. These factors also confirm the validity of the consent search of Mrs. Holmes's apartment under the Fourth Amendment.

The evidence and the testimony shows that Mrs. Holmes's consent to the search of her apartment was freely given and that the police did not engage in misconduct to obtain it. Mrs. Holmes was a third party who had authority over the 1773 Gowan Street apartment leased in her name. Detective Evans testified that he was aware that the apartment was held in her name based on the phone call he had made to the Timber Pines leasing office earlier that day. Further, Detective Evans noted that when Holmes answered the door of the apartment, Holmes stated that he did not live there. This prompted Detective Evans and Officer Hudson to properly request the consent of Mrs. Holmes to search the apartment, rather than the arrestee, Holmes.

Mrs. Holmes's testimony regarding the police's request to obtain her consent corroborated Detective Evans's testimony. Both testified that the officers approached her in her living room, explained the complaint against Holmes, requested her consent to search the apartment, and indicated to Mrs. Holmes that she had the option to say yes or no. Mrs. Holmes stated that she was "shocked" by Holmes's arrest and a little scared and shaken up by the incident; however, she was not the arrestee and testified that she was not afraid that the police believed she was involved in any crime. Both Mrs. Holmes and Detective Evans testified that Mrs. Holmes was not coerced to sign the consent form, and the court finds that she acted upon her own free will

to consent to the search. *See United States v. Parker*, 469 F.3d 1074, 1077-79 (7th Cir. 2006)(holding that the co-tenant's consent to search the home was sufficiently attenuated from the defendant's illegal arrest because the co-tenant's consent constituted intervening circumstances as an act of "free will" independent of the defendant's arrest). Detective Evans also noted that Mrs. Holmes was cooperative and nice, was unrestrained, and accompanied the police throughout the apartment because the situation was under control.

While Investigator Knoblock testified that Mrs. Holmes told her that the police asked Mrs. Holmes to sign the consent form or go to jail, Mrs. Holmes testified that she did not recall saying that and stood by her testimony that she consented without coercion. As previously noted, Mrs. Holmes's testimony was given under oath, while her conversation with Investigator Knoblock over the telephone was not. The court, therefore, gives weight to Mrs. Holmes's testimony under oath.

Further, the testimony did not show that the police engaged in flagrant or otherwise blatantly unconstitutional misconduct. *See Richardson*, 949 F.2d at 858-59 (finding the consent search was not sufficiently attenuated because "the constitutional violation was blatant" when the police placed the defendant in the back of a police car, was not permitted to leave, and consented to a search twenty minutes after continued misconduct). There was no evidence of coercive tactics violative of the Fourth Amendment other than Investigator

Knoblock's testimony, which the court does not find controlling. Rather, the police followed protocol by explaining the circumstances, informing Mrs. Holmes of her right to consent or refuse, and obtaining her written consent. Thus, if Holmes's arrest was illegal, there was a sufficient break in the causal connection between Holmes's arrest and Mrs. Holmes's consent such that the evidence derived from the search should not be suppressed. The court therefore recommends that Holmes's arrest warrant and the consent search of the apartment be considered separately and that the consent search be upheld as a valid search under the Fourth Amendment.

## III. RECOMMENDATION

For the reasons expressed above, it is recommended that Holmes's motion to suppress be denied in full.

Respectfully submitted this 9th day of December, 2013.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE